Our first case for argument this morning is Bulk Transport v. Teamsters Union Pension Fund. Mr. Trapp. Thank you, and may it please the Court, Mark Trapp for the comment. Ten years ago, the parties asked the arbitrator assigned to hear this case, the central legal dispute, to decide the central legal dispute, which was submitted to be whether the steel mill addendum covers the LISCO work. Notwithstanding the fact that the express written terms of the steel mill addendum were limited to steel mill operation work, and the parties stipulated that the LISCO work was not included within that definition, the arbitrator determined that the parties had adopted that written agreement to apply to the LISCO work. He thus held that my client was required to make contributions under that agreement that were forbidden by the express written terms of that agreement. Although the district judge acknowledged that he struggled with the decision and that it was close and could have gone either way, he ultimately affirmed the arbitrator. That question is now before your honors, and your review of that legal issue is de novo. Whether or not an obligation to contribute exists under a collective bargaining agreement is and always has been determined by the written words of that agreement, and it has never been determined by unwritten understandings or conduct of the parties. I'm a little puzzled by the assertion in that form. Never been determined by unwritten things? Isn't there a long line of cases saying that people can adopt a collective bargaining agreement by conduct? There is, your honor. There's a very long line. Right. So you have people bound by a collective bargaining agreement, although their name isn't on it. They've never signed. That is correct, your honor. Well. What I meant by that is. So I think you need to make your point a different way. I'm sorry. Let me clarify my point. When I say it's never been determined by unwritten understandings or conduct, I mean it's never been determined to be contrary to the written terms of the agreement. Every time that any court has used conduct to enforce an agreement, it has always been consistent with the written terms of that agreement, and I will stand on that. Except with respect to who the parties are. Sure. And I'll get into that, your honor, because I think that whose ox is gored makes no difference, because the statutes that Congress has written very clearly say that the written terms are what determine the contribution. And I don't think that it can really fairly be otherwise. Not for my client's sake or for the fund's sake, because funds would ultimately be harmed if the written word were not sacrosanct in ERISA disputes, as it is. And, again, as it always has been. Many employers would choose not to participate in such plans if they knew that they could not rely on the written words, but the funds could. So the funds could either adopt the written words if they preferred to, or adopt unwritten conduct or some supposed understanding contrary to the written words, as long as they felt that that benefited them. That would ultimately harm pension funds, and that is precisely why Congress passed Section 302 of the Labor Management Relations Act, to make it clear that you could not contribute to a pension fund without a written agreement that provided the detailed basis, and a fund could never accept contributions for which there was no written obligation to contribute. And here, again, there is no written obligation to contribute. The written terms expressly exclude the contributions that are at issue here. And this Court has said in the Joe McClellan case, no matter what. What do you think the consequence of your clients, what you describe as illegal contributions, what is the legal consequence of making illegal contributions to a pension plan? I would say that the question is whether we're obligated to do so, and I would say we cannot be obligated to do something that's illegal. On your view, all of the contributions made for the LISCO work were made in violation of federal law. That's fine. You seem to think that this gives you some benefit now. Why is that true? Why doesn't it just mean you're subject to criminal prosecution? Because the question before the Court is whether we're obligated to make that contribution, and I would submit that, as Your Honor is, I think, stating— It's not the collective bargaining agreement that makes this obligation. It's the Multi-Employer Pension Plan Amendments Act, which provides for withdrawal liability. Your premise, it's an unargued premise, seems to be that if the contributions were illegal, there cannot be any withdrawal liability. What's the basis for that contention? Quite simply, Your Honor, the contributions that would be illegal, you cannot be required to do something that is illegal. No, the contributions were illegal on your view. Withdrawal liability is not illegal on your view. Why is it that making illegal contributions frees you of withdrawal liability, which is imposed by statute rather than by a collective bargaining agreement? Because the Multi-Employer Pension Plan Amendments Act requires, in order for a contribution to be counted as a contribution-based unit, you have to have been obligated to make that contribution. Otherwise, people could avoid withdrawal liability simply by not making contributions. Or they could continue contributions that are not required and avoid withdrawal liability that way. The determination is whether you're obligated, not whether the fact that the contributions have been made or not. And that's very clear throughout all the Multi-Employer Pension Plan Amendments Act cases. And here, it was clear in this case. We actually argued that point in front of the arbitrator. And he found for us, and it's already been decided, and the parties have since stipulated that if we were not obligated to make these contributions, then there can be no withdrawal liability. That's been stipulated by both parties. And here, I've— I don't think you can stipulate a point of law. Well, I mean, it was already decided by the arbitrator, and it's been— You're not accepting the arbitrator's other decisions. But we did accept that one. That was never appealed by anyone, and that was never taken up as a point to be argued. Everybody agreed that you had to be obligated to make the contributions in order for them to count. And that's a statement of law that is not contested or contestable. You have to have been obligated. Otherwise, the Multi-Employer Pension Plan Amendments Act would fall on its face. Employers could manipulate it however they chose simply by making contributions or not. And that's not how the law turns. And ERISA, throughout ERISA, in whatever context you're talking about, whether it's benefits or Multi-Employer Pension Plan Amendments Act or Section 515 contribution cases, which are maybe the most popular cases in federal court, the written terms of the agreement are always and everywhere central to the dispute. And I would say that prior to the district court's ruling here, there has never been a case like this. There has never been a case—this goes back to my point from earlier, Judge Easterbrook, when I said that it's never been determined by unwritten understandings or conduct. I modify that to mean it's never been determined by unwritten understandings or conduct that is contrary to the written terms of the agreement. And I don't know why any pension plan would want it to be otherwise, because if employers realize that they are not allowed to rely on the written terms, that they negotiate with the union and put in writing and sign, as we did here, and then the union can come along and force, cajole, corral, whatever you want to call it, and have our clients make contributions that are outside those express written terms, that, in my view, clearly violates Section 302 of the Labor Management Relations Act. And I don't know how it could be otherwise. I think if we step back and see that if we were here, if I was here, Your Honors, and we had reached an agreement with the union to not contribute for work that was clearly covered, I think I would rightly be laughed out of the courtroom. And Your Honors would say, that's clear that you cannot rely. And these two would be laughed out after Gerber Truck. We had to sit on bunk in order to resolve that issue. Yeah, and Gerber Truck is—Your Honor wrote Gerber Truck and made it very clear. That's irrelevant. Your Honor made it very clear that— That is irrelevant. Okay. You don't want to make ad hominem arguments. Gerber Truck made it very clear that any unwritten understandings contrary to the writings are not enforceable. I think the quote was, The Labor Management Relations Act and ERISA prevent a court from giving force to oral understandings between union and employer that contradict the writings. It's undisputed here that this agreement, so-called conduct, whatever the tacit understanding, which was really just fueled by making those contributions under duress, contradicts the writings. The writing in this case specifically says, This agreement shall apply to the steel mill operation work only. And that's bolded. It's underlined. It's the first sentence of the agreement. That determines everything about the agreement. The fund, in its brief, said, well, that's just a little flaw on the face of it. The work jurisdiction clause of a collective bargaining agreement is the end-all, be-all of that agreement. It determines what work is covered by that agreement. And here, it's specifically limited. And by the way, the union were the ones that insisted on that. Then, lo and behold, we get some work that's outside those terms, and the union refuses to bargain a new contract and says, apply that one. I would submit that under Section 302, Congress never intended to allow a union to secure a narrow written- In the world, does it matter what members of Congress intended? And how did you get any private access to their thoughts? You're right, Your Honor. I take it back. I would say that the Section 302 expressed language- We want to know what the statute provides. Section 302 states, it shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value, unless the detailed basis on which such payments are to be made is specified in a written agreement with the employer. And as Your Honor pointed out, that's a criminal statute. I think that there has to be a written agreement. There's a case from the Second Circuit, the Moglia case, says there has to be a written agreement. Any contributions without a written agreement that provides for those contributions are absolutely forbidden, it says. And it goes on to say, this is not a minor technicality when one party might be otherwise estopped. There has to be a written agreement. And going back to my earlier point, I would submit that that statute precludes a union from securing an agreement on a narrow basis, which is what happened here, and then going around and applying it to other work to which it was never negotiated to apply. I think that's not only fundamentally unfair, it blatantly contradicts the Labor Management Relations Act, Section 302. It would allow unions to say, don't worry, guys, just sign here. You only need to cover these three employees. We would sign the agreement, and then the union would say, hey, you know what? You need to cover those 10, 15, 20 employees, even though these written words do not cover it. And if they successfully secure it, then a court would uphold it. I can't imagine that that's the case when the written word is always and everywhere sacrosanct. Mr. Trapp, if we reverse the district court on this adoption by conduct argument, are there any facts supporting a second contract involving the Levy Company work? What do you mean by the second contract? Supporting a second contract. Any facts supporting any agreement with regard to that work? It was stipulated before the arbitrator, and it's never been contested, that the contract with the levy folks, we could never get it, and it was just stipulated that the LISCO work was not steel mill work within the terms of the steel mill operation work that were covered by the steel mill addendum. So it was expressly excluded. It was meant to be that way, and the union insisted that it be that way, and that's what we did. And it's been stipulated further, Your Honor, here, that if the legal issue here is decided, you know, if you affirm the district court, that's it, obviously. If you reverse, then that means that there's no withdrawal liability. As I said, that issue was already decided by the arbitrator, and the fund has taken the position in its briefing that if there's no obligation to contribute here, then that means that there could have been no withdrawal liability. Because, Your Honor, those contributions were what raised the supposed contribution-based units to a very high level. When the union later went on strike against a different company, not my client, and we lost the work, the contributions fell. And so not only did we have to pay for contributions that were not required by the written agreement, seven years later, the pension fund showed up and said, now you owe us withdrawal liability. I submit that that's unfair. I see I'm into my rebuttal time, and I'd like to reserve that, if I could. Thank you, Your Honor. Thank you, counsel. Mr. Weishample. Yes. Good morning, Your Honors. May it please the court, my name is Joe Weishample. I represent the trustees on the fund in this case. I'll refer to them collectively as the fund. Your Honors, we're here because Bulk wants a loophole, the kind of loophole this court has warned against. They're now claiming the steel mill addendum did not apply to the LISCO work. At the moment, at the time of the work… Well, it seems quite obvious that its language does not apply to the LISCO work. Now, my question for you is in some ways the same as the one I had for Mr. Trapp, but from a different angle. I understand there are a lot of cases saying that an employer can adopt an existing collective bargaining agreement by contract. Sorry, by conduct. Are there any cases saying an employer can change a collective bargaining agreement by conduct? There is not a specific case, but the… When you say not a specific case, I think you mean not any case. I looked, too. I couldn't find any. And isn't that a serious problem when you have a statute that says the agreement must be in writing? If you can make changes by conduct, then the agreement doesn't have to be in writing. Anything goes. That's a serious problem, is it not? Well, as we see it, there was an existing contract. But it didn't cover this work, right? Suppose the collective bargaining agreement says at Ford's plant in Michigan the following terms apply. And the contract says only Michigan. And then the union tells Ford to make the same contributions for Illinois. I mean, that's not adopting a collective bargaining agreement by conduct. It's changing it by conduct. And that's the problem we have under Section 302. Really, are there no cases? As I say, I looked. Your brief doesn't cite any. We feel the most similar cases are the adoption cases and the reason. But in the history of labor law, now 100 years old, there are no cases about change by conduct. It's a serious problem. There are cases regarding Section 302 that certainly say the writing can have certain imperfections, certain apparent non-applicability to the work. But this court in Bricklayer said the existence of the contributions plus a written agreement between the parties setting forth those contributions amount effectively ends the inquiry. And this relates back to the Section 302 analysis in that the analysis has always been, what are the purposes of the writing? And the two key purposes here are to prevent union exploitation and to provide certainty so that every party can know the terms of the contract. In the Alaska case, the court said that the writing only needs to provide a sufficient safeguard against the illegal payments that Section 302 was designed to prevent. And now what we have in this case, we have the steel mill addendum. The steel mill addendum plainly says your pension contributions are $3.50 an hour and they are to be made to the pension fund, my client. If you look at the letter written by Volk's comptroller, Deborah Jones, to the union at the outset of the work, she acknowledges that for each hour of the work they will contribute $3.50 to the pension fund. So this aligns with other Section 302 precedents that have found, for example, that an unsigned CBA can suffice as a Section 302 written agreement. An expired CBA can also do so. An unenforceable contract can satisfy Section 302. The fund's own trust agreement can be the writing demanded by Section 302, or even a repudiated pre-labor agreement can satisfy Section 302. This is all significant because all these analyses relate back to, is it certain and does it prevent union exploitation? Mr. Weisampel, what would be the limits of the adoption by conduct theory? Would it apply to non-union employees? Would it apply to unrelated work? If we're going to go down this road, how do we circumscribe it? Your Honor, for this case, I'm sorry, I think what the precedents demand is all or a significant number of the adoption indicia being present. This Court has used for those indicia the payment of union wages, the payment of contributions, submission to union jurisdiction, remission of union dues, and other agreements between the employer and the union. And if we were to rule your way under that type of theory, what's the stopping point? That would be a factual question. I would, you know, it would have to be limited to contribution obligations, perhaps employee by employee, perhaps union membership would be a factor and non-membership would exclude that employee. Union membership, that's a prohibited consideration. There's no clear pathway here for delineating the stopping point for adoption. However, what we have... But you see that's why writing becomes so important, right? I agree. Fortunately, in this case, we have absolute compliance with the addendum. We don't have really any line... Except for its provision about what work it covers. That's accurate, Your Honor. But we do. Well, right, you take another example. You have a hospital with a collective bargaining agreement for a group of nurses. Union demands that a totally different bargaining unit, say orderlies, be covered by the same pension plan. The hospital goes along. Does that satisfy the writing requirement? That would not. Why? Because there's no... Here we also have the bargaining history for this work and these workers. In that case, I don't believe there would be a bargaining history for the orderlies. We just have, in this case... Might be, there might not be. But bargaining history doesn't sound remotely like agreement in writing. Right. Bargaining history, however, would illuminate the employer's intent to be bound with respect to that group of employees and would indicate some degree of assent to making contributions. Your Honors, again, this Court has said repeatedly, we're not going to take a formalistic approach to binding CBAs in the adoption context. This Court has always looked to conduct manifesting assent and the employer's intent to be bound, and this is the clearest element of this case, that the employer had before it the LISCO work. It was lucrative work. It was done by union members for the previous employer, and the employer here both made a calculated decision to employ the terms of the steel mill addendum in order to get the work completed. That's simply a textbook case of adoption, and the fact that there was work jurisdiction language excluding this work is militated against by the fact that Bulk ignored the work jurisdiction language. Bulk simply imported these terms and put them on the work. Bulk could have at any point, you know, taken a more affirmative step than attempting to negotiate with the union by invoking the work jurisdiction language and saying, hey, this doesn't actually apply. And it's important that they paid the workers and treated the workers under the addendum. That's the key factor rather than their expressed desire to negotiate a contract because this Court in Robbins v. Lynch repeatedly referred to an actor's intent as manifested by their actions as the intent that controls. So asking for a new contract is not enough when you're keeping the contract in place that you don't like, and it's especially not enough after April of 2005 when the union wrote a letter and said it's our view that the construction agreement and the addendum apply and you should apply them to the work, and Bulk did not change its behavior. At that point, it's not only assent, it's assent in light of knowing that the adversarial party agrees with you. Bulk really is trying to have it both ways by getting the work done and now getting out of its withdrawal liability obligation, and we'd urge your Honors to reject that. In terms of adoption versus modification, we see this as an adoption case. If we hold that the contributions were illegal, what happens to the workers' pension credits? The pension credits would have to be revoked if we went so far as ruling the contributions illegal. Do you think there's any statute of limitations for that? Very likely for the criminal aspect. I am not familiar with the— It's six years, I believe. If that is the general one, yes, I believe that would apply, Your Honor. So it would be too late to revoke the pension credits? Yes, and so that if we lose the withdrawal liability amount, that would, again, that would widen the fund's unfunded vested benefits to the fund's detriment. The slate of a—I'm sorry, I apologize. The hallmark of an adoption of a CBA is when there is a slate of terms in an existing CBA and uncovered workers and the employer, by its actions, demonstrates its assent for those terms to apply to those workers, and that's why we see that as an adoption case. And additionally, adoption and modification differ in three crucial ways. First of all, adoption is a binary switch. When you have an adoption inquiry, you're talking about whether the employer switched on all the terms of the agreement to apply to the workers or whether it did not. Modification is, in an ongoing contract, you have a change to a term or terms, usually monetary terms, and usually that sort of change kind of interferes with the plan's ability to plan its benefits. When you have an adoption, you're going on script. You have these terms, they're written, they exist, and you have a writing that confirms how you are going to treat the employees and you are adopting it for those employees. Modification is problematic because you're going off script and now there's nothing that really accurately describes what is happening with the employees and their entitlements. And finally, adoption creates certainty. Adoption recognizes the employer, not the employer and the union, specifically the employer is treating the work a certain way and we can rely on that as legally binding against the employer, and the fund did rely in this case. Modification is uncertain. It creates a lack of certainty because now you have a discrepancy. In this case, the treatment of the steel mill addendum is far closer to an adoption under these elements than it is to a modification. Again, we submit this cannot be deemed a modification simply because of work jurisdiction language that Bulk itself ignored when it wanted the work done. That's the sort of loophole this court has mourned against. Counsel, what's your strongest case for adoption by conduct? I'm sorry? For adoption by conduct is the Bricklayer's case because it has... Which case? Bricklayer's Local 21 from this court in 2004, I believe. Yeah. Because what happens there is some degree of compliance, including some payment of contributions, and that is found to be adoption. And then additionally in that case, the employer also raised the written agreement requirement argument, and that was rejected because there was the agreement setting forth the payments, the actual payments, and the court looked at those and said, those match and that ends our inquiry. That's factually quite different than this case, right? It differs in terms of a CBA being unsigned versus a CBA with work jurisdiction language that, read in a vacuum, would not encompass this work. Your Honors, opposing counsel made some comments regarding the possibility that funds would be hurt down the road by the position that we're taking. Section 515 of ERISA was passed as part of the Multi-Employer Pension Plan Amendment Act in 1980. The intent of that act was to not let employers repudiate their pension promises and slip away without paying and to simplify the type of litigation we're engaged in here. Does it make sense that Section 515 has never been used to relieve an employer of its liability when the employer has adequately demonstrated its assent to the terms in question? In fact, the Sixth Circuit in the Oren v. Scassa case from 2015 specifically said Congress chose to give funds the upper hand in Section 515 collection litigation. That is, from the Sixth Circuit, this circuit's precedents have aligned with that idea precisely, specifically the recent Transervice case and the Gerber truck case from 1989. There's extensive discussions about the employer and the union being bound by the writing and the fund being able to rely on the writing when the employer and the union, or at least the employer, attempts to contribute lesser amounts than the writing calls for. These cases do not stand for the proposition that an employer can repudiate its adoption of an agreement and disavow its contributions based on some imperfection in the writing that it adopted. There's also language in Transervice, Gerber truck, and other cases regarding the need to protect the fund's legitimate expectations so that they can plan their benefits, so that the funds themselves are financially secure. Those are considerations that are specific to pension funds. These cases do not reflect a similar concern for the employer's financial well-being, and that aligns with congressional intent and the purpose of the statute. How do you know what is in the head of members of Congress, and why do you think the contents of their heads matter? That's fair, Your Honor. The Supreme Court keeps saying over and over that we go by the language of the statute. If you could cut open members of Congress's heads, you wouldn't really get anything helpful. Probably not, Your Honor. Perhaps the real-world context immediately before the passage of MPPAA in 1980 is helpful, and I think Congress recognized that in coming to the view that these procedures should be accelerated. That's not just the intent of Congress. That's how the cases have been. Oh, boy. Congress is not talking that way, isn't it? Yes. That aligns, though, with how the cases have come out, how courts have reflected on what the statute means. And in this case, the concerns are very well placed because, again, Bulk imposed these terms unilaterally. Bulk imposed them. Bulk imposed $19.50 an hour as a wage. That matches the addendum. Bulk imposed $3.50 an hour to my client, and that matches the addendum. Bulk imposed $5.12 to a health and welfare fund, and that matched the addendum. The fund, under any legal theory, was entitled to rely on these overt actions that matched an existing writing, the steel mill addendum. There's no case that says that the fund erred by relying, and there's no case that says that Bulk can repudiate what it has done. Additionally, labor law generally supports the finding of a contract between Bulk and the union because, after all, if the steel mill addendum is not that contract, then the union is out in the cold.  And all the ways that Bulk treated the employees as union members were inappropriate and incorrectly founded if the steel mill addendum did not apply. Labor law cases? I'm lost. Being a union member and having a collective bargaining agreement are different things. They were still union members whether or not their work was covered by a particular collective bargaining agreement. That's correct, Your Honor. The point I'm attempting to make is it would be an extremely odd result if all the terms of a collective bargaining agreement were imposed, but then it was legally determined that nothing was in place at all. That's why labor law principles don't control specifically, but the general thrust of labor law militates in favor of finding that the addendum applied. To speak to the cross-appeal regarding attorney's fees. Maybe my grasp on labor law is slipping, but my understanding is that if an employer bargains to impasse, it can use whatever terms it last proposed to the union. It seems that's what Bulk did. The union refused to bargain and Bulk used the terms it had proposed. Any problem under labor law? There's only a problem under pension law. That would be consistent with labor law, Your Honor. That does bring us back to the section 302 question. It doesn't directly answer the section 302 question, but section 302 we believe is satisfied for other reasons because of the non-technical analysis that the court engages in, because the addendum provides certainty, and because there was simply no union exploitation here. As to fees, we believe the district court erred. Fees are presumptively appropriate where a party loses at arbitration, as Bulk did, goes to the district court, and loses there as well. The standard is whether Bulk's arguments are substantially justified. In our view, they were not. In our view, the facts presenting the case for adoption here are uniform, are far beyond what was present in Garriott and Bricklayer's and the other adoption cases. So we believe attorneys' fees are merited and that the district court abused its discretion. The district court had quite a lot of candor to say it was a tough call for him, and on that basis he was going to find it to be substantial. Understood, understood. And certainly there is not a specific case under these facts where work jurisdiction language was the impediment to adoption rather than the lack of a signature. And I'm sorry, my time has run out. May I briefly conclude? You can always finish answering Judge Brennan's question. I'm sorry, did I? You did. Thank you. Okay. Thank you, counsel. Thank you. Anything further, Mr. Trapp? Thank you. Thank you, Your Honors. Just a couple of brief points. For 10 years I've thought about this loophole argument, and I don't see how it can be a loophole. It's only a loophole if you assume the obligation, and that's the whole point is you can't assume the obligation. You have to prove it and establish it by written terms, and the case that's been cited for that repeatedly, this Line Co case, referred to the loophole, and the loophole sought there was a departure from the written terms of the agreement, not enforcement of the written terms. Just a brief comment about the adoption cases, and particularly the bricklayer's case, which my colleague said was the best case for adoption. That case is totally distinguishable, as is every adoption case. The only reason you turn to adoption by conduct is if the parties did not sign the agreement, and here we signed it. We negotiated it. We wrote it out. We signed it. Isn't that the difference between bricklayers? Yeah. I think in bricklayers they didn't sign the agreement. The written words of the agreement specifically covered the work that was issued, and the opinion actually states that. The quote from the court was, the parties do not dispute that the contributions made to the funds were made in accordance with the terms of the written CBA, and I have no quarrel with adoption by conduct. I'm very well versed in that, and I think everybody is, that that's how it works, but here it's a square peg in a round hole. It doesn't fit because we signed the agreement. The written terms do not cover it, and so any contributions made contrary to the agreement cannot be deemed consistent with that written agreement, and my colleague has said that Balk ignored the written terms. Well, that's not exactly true. For 16 months, the entire 16 months, it stipulated that we were repeatedly and continuously objecting and saying, you can't do this to us. This is not how this works. You have to negotiate another deal, and they refused, and then at the end they just said, just apply that agreement, and it's not fair to say that we ignored it, and particularly when we're here not ignoring it. Why is it that the fund wants the court to ignore the written terms? I can't think that a decision from the Seventh Circuit ignoring the written terms is one thing, or the union ignoring the written terms is one thing. A decision from the Seventh Circuit is another, and finally I would point the court to the Tackett decision from the Supreme Court, which says ordinary contract principles have to be applied here, and that the enforcement of the written terms is especially appropriate in the ERISA context. Both of those apply here because this is obviously the ERISA context. Before you see the problem from the union's perspective, they are on the hook for paying benefits to these workers. It's apparently too late for the pension credits to be rescinded, but the contributions both made are insufficient. This is an underfunded pension plan, and that's what the 1980 amendments were all about. Level up when you contribute not enough to an underfunded plan. Your argument would be stronger if it had been made in time for the pension credits to be revoked, though I understand you probably didn't want to do that bad turn for your workers. Yeah, well, here the contributions were made, so it's not as if that obligation was unfunded. Those contributions were made, and we never asked for them back. It's underfunded. The plan is underfunded, or there would be no withdrawal liability anyway. That was true. I don't know if it is any longer under the American Rescue Funding Act, where they may or may not have gotten funding for that. You're right, it was underfunded, but it wasn't specific to these workers because we made those contributions. And so they got the money. Whether they apply the credits or not is, I think you're right, it's a six-year statute of limitations under Section 1451. But finally, Your Honor, I would just say that, again, to end on Tackett, Tackett says that you have to apply ordinary contract principles, and applying the contract as written when the fund prefers it, but not when the fund does not prefer it, is not applying ordinary contract principles. And I would close with that, and I would respectfully ask Your Honors to reverse the decision of the district court. Thank you. The case is taken under advisement.